UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GAYLE GEORGE**, <br><br> Plaintiff, <br><br> v. <br><br> **OFFICE OF CHIEF TECHNOLOGY OFFICER GOVERNMENT OF THE DISTRICT OF COLUMBIA**, <br><br> Defendant. | Case No. 19-cv-02057 (TNM) |

## MEMORANDUM OPINION

Gayle George appears *pro se* to sue her former employer, the District of Columbia. She raises sex discrimination and retaliation claims under the Equal Pay Act and Title VII. George claims that she received less pay than her male colleagues and experienced discrimination and retaliation after she raised complaints about her unequal pay, which led to her termination.

The District moves for summary judgment. It argues that George's salary differed from her male colleagues based on her responsibilities and status as a non-career service employee. The District asserts that it terminated George for failures on two projects while she was a probationer. At summary judgment, George must offer evidence to undermine these legitimate, nondiscriminatory and nonretaliatory reasons. She has not done so. The Court thus will grant the District's motion.

## I.

The District hired George as a Program Analyst with the Office of the Chief Technology Officer ("OCTO") with a $93,000 starting salary.  Def. District of Columbia's Mot. Summ. J. ("Def.'s Mot.") Ex. B, Offer Letter, ECF No. 24-4.[1]  She started on a one-year probationary period.  *Id.*  George had requested a higher salary from her prior role as an adjunct professor at the University of the District of Columbia ("UDC").  Def.'s Mot. Ex. C, Decl. of Carol Harrison ("Harrison Decl.") ¶¶ 5–8, ECF No. 24-4; Pl.'s Mem. P. & A. in Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Opp'n") ¶ 3, ECF No. 27-1.  The District denied her request because the documentation did not justify a higher salary.  Harrison Decl. ¶ 8; Pl.'s Opp'n ¶ 3.

George ultimately accepted the offer and started in the Program Management Office ("PMO").  Harrison Decl. ¶ 4.  Her role as a Program Analyst was non-managerial and entailed "gathering and collating data" for Program Managers and Deputy Chief Technology Officer David Bishop "to make decisions" about projects for District agencies.  *Id.* ¶¶ 7, 14.  "The purpose of the [Program Analyst] is to analyze, evaluate, and provide information concerning the effectiveness and efficiency of District-wide programs as they relate to District agencies within an assigned focus area."  Def.'s Mot. Ex. E, Program Analyst Description at 39, ECF No. 24-4.[2]

---

[1] George summarily objects (without evidence) to all of the District's proposed facts except the date of her termination.  *See* Pl.'s Statement of Material Facts at 1, ECF No. 27-2.  And nearly all of George's proposed facts include no citations to the record.  *But see* Standing Order ¶ 13(B)(vi), ECF No. 4 ("The responding party must include any information relevant to its response in its correspondingly numbered paragraph, **with specific citations to the record**." (emphasis added)).    This was improper and hinders the Court's ability to winnow wheat from chaff in both parties' allegations.  The Court relies on documentary and testimonial evidence where possible.

[2] All page citations, except for deposition transcripts, refer to the page numbers that the CM/ECF system generates.  Citations for deposition transcripts refer to the page number of the transcript.

The District assigned George to work with "Public Safety and Justice" agencies. *See* Pl.'s Statement of Material Facts ("Pl.'s SOMF") ¶ 1, ECF No. 27-2; Pl.'s Opp'n Exs. at 12, ECF No. 27-4.[3] She "was the only Program Analyst in the PMO." Harrison Decl. ¶ 13.

The other ten employees in the PMO served as Program Managers or IT Program Managers. *Id.* ¶¶ 11–12. A Program Manager provides "project management consulting support and assistance to District agencies within an assigned focus area." Def.'s Mot. Ex. F, Program Manager Description at 44, ECF No. 24-4.

In January 2016, Archana Vemulapalli became Chief Technology Officer. Harrison Decl. ¶ 15. He then fired Bishop, who was involved in George's hiring. *Id.* ¶ 16; *see also* Pl.'s Opp'n Exs. at 2. Vemulapalli launched a realignment of OCTO, which included the PMO. Harrison Decl. ¶ 17. PMO employees received new projects under this alignment. *Id.* ¶ 18.

Vemulapalli assigned George and four other employees "to work internally" on an IT Services Catalog Project ("Catalog Project"). *Id.* ¶¶ 22–23. The reassignment came with no change in salary or other compensation for George. *Id.* ¶ 26. Then-Acting Chief of Staff Carol Harrison managed the Catalog Project. *Id.* ¶ 20. Besides George, OCTO also reassigned Shani Jones—a supervisory IT Specialist—and three Program Managers to the Catalog Project. *Id.* ¶ 23. All other PMO colleagues also received new assignments, except Program Managers Khaled Falah and Bruce Jones. *Id.* ¶ 24. Those two remained "on external-facing projects with direct outreach to agencies." *Id.*

---

[3] George references exhibits A through S in her opposition, *see* Pl.'s Opp'n Exs., ECF No. 27-4, but none of the 73 pages is so marked. The Court need not "sift through" her exhibits to decide "what may, or may not, be a genuine issue of material fact." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996) (cleaned up).

The Catalog Project "was essential to OCTO." *Id*. ¶ 25. "It was meant to serve as the gateway . . . for direct purchases by client agencies, service requests, or requests for consultation," and it "automate[d] functions that had previously been handled by up to ten employees" in the PMO. *Id*.

Harrison claims that George committed several mistakes before and during the Catalog Project. George "failed to timely approve a requisition in the Procurement Automated Support System," which left her client, the Metropolitan Police Department ("MPD"), "rightfully frustrated[.]" *Id*. ¶¶ 30–31 (cleaned up). The delay prompted MPD's "cancellation of a critical, regional data sharing initiative to improve situational awareness and coordination across regional public safety agencies." Def.'s Mot. Ex. K, Email Exchange at 60, ECF No. 24-4. George did not "timely submit documentation that was critical to the successful completion of the procurement." Harrison Decl. ¶ 31. She also "failed to complete projects assigned to her as part of the IT Services Catalog Project." *Id*. ¶ 32 (listing incidents). For instance, George received "an assignment on April 21, 2016 that was due on June 9," but George had not completed it as of July 1. *Id*. ¶ 32a.

Harrison ultimately recommended George's termination. *Id.* ¶ 29. Vemulapalli and Human Resources both approved it. *Id.* The District terminated George on July 8, 2016. Def.'s Mot. Ex. J, Termination Letter, ECF No. 24-4.

The District contends that it terminated George for the failures she committed while on probation. Harrison Decl. ¶ 33. It denies that her "complaints about pay" or her "filings with the D.C. Office of Human Rights" played any role. *Id.* ¶¶ 34–35; *see also id.* ¶ 36 (Harrison declaring she "was not aware" that George had "filed an internal EEO complaint prior to this litigation").

George disputes nearly all these facts. She counters that she "was assigned responsibilities of a Program Manager," was a Program Manager "in practice," and was never "formally or informally referred to as a Program Analyst, until these proceedings." Pl.'s SOMF ¶ 1. George also contends that she "was never officially or publicly assigned" to the Catalog Project, and not "named in the team announcement" or "assigned to any specific or general task." *Id.* ¶ 7. Yet she "was the only one terminated for its failure." *Id.*

George states that she "was never written up or counselled about her performance or any incident." *Id.* ¶ 11. To George, "[e]very 'non-discriminatory' performance-based issue cited for her termination took place after [she] had taken considered protected action." *Id.*

George sues the District under the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1) ("EPA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Compl. II.A. at 3, ECF No. 1. She alleges that the District discriminated against her as the "only woman working" as a "Program Manager." *Id.* III. at 4. George claims that the District paid her "$40,000-$50,000 less than each of her male counterparts including one who started working one month after her start date." *Id.* She also asserts that the District retaliated against her "in various forms, including termination without cause" after "expressing her concern and engaging in protected EEOC activities." *Id.*

The District moves for summary judgment. Its main contention is that George received the appropriate salary based on her position and because she was not a career service employee. Def.'s Mem. P. & A. in Supp. Def. District of Columbia's Mot. Summ. J. ("Def.'s Mem.") at 11–17, ECF No. 24-1. The District also argues that it terminated George for her failures on the MPD project and Catalog Project, which she committed on probation. *Id.* at 34–37.

5

George counters that the case should proceed to trial. Pl.'s Opp'n at 12. The District's summary judgment motion is ripe for disposition.[4]

## II.

To prevail at summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" if it could alter the outcome of the suit under the substantive governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (cleaned up). Once this showing has been made, the non-moving party bears the burden of setting forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (cleaned up).

The Court is mindful that George is proceeding *pro se*. So it applies "less stringent standards" to her opposition brief. *Prunte v. Universal Music Grp., Inc.*, 699 F. Supp. 2d 15, 21–22 (D.D.C. 2010) (cleaned up). Even so, the opposition "must consist of more than mere unsupported allegations and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial." *Id.* at 22.

---

[4] The Court has subject matter jurisdiction under the federal question statute, 28 U.S.C. § 1331.

### III.

When, as here, the jurisdictional prerequisites of Title VII and the EPA are satisfied, a violation of the EPA "is also a violation of title VII." 29 C.F.R. § 1620.27(a). But because "title VII covers types of wage discrimination not actionable under the EPA," an action "that is not a violation of the EPA may nevertheless be a violation of title VII." *Id.*; *see also Wash. Cnty. v. Gunther*, 452 U.S. 161, 181 (1981) ("[C]laims of discriminatory undercompensation are not barred" under Title VII "merely because respondents do not perform work equal to that of male jail guards").

The Court thus addresses George's discrimination claims separately under the EPA and Title VII and then considers the retaliation claims under both statutes.

### A.

The EPA makes it unlawful for an employer to pay wages to employees "at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). "Actual job performance and content, not job titles, are key[.]" *Soto v. Adams Elevator Equip. Co.*, 941 F.2d 543, 548 (7th Cir. 1991).

To succeed, George must show that she (1) "was doing substantially equal work on the job as members of the opposite sex, (2) that [her] job was performed under similar working conditions, and (3) that [she] was paid at a lower wage than those members of the opposite sex." *Perez v. D.C. Dep't of Emp. Servs.*, 305 F. Supp. 3d 51, 56 (D.D.C. 2018) (cleaned up).

"Once a prima facie case has been made out, the defendant may rebut the showing of equality, or assert one of the [EPA's] affirmative defenses." *Goodrich v. Int'l Bhd. of Elec.*

7

*Workers, AFL-CIO*, 815 F.2d 1519, 1523 (D.C. Cir. 1987). That is, the employer can show that "payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Simply put, the employer must "prove that unequal payments are made pursuant to some legitimate, non sex-based factor." *Goodrich*, 815 F.2d at 1523–24.

George first faults the District for denying her request for a higher starting salary based on her compensation as a UDC adjunct professor. *See* Pl.'s Opp'n ¶¶ 3, 12. She claims that the District determined her starting salary using the *amount* UDC paid her, but calculated the starting salary of Bruce Jones—another OCTO employee hired shortly after her—based on the "*rate* at which he was previously paid." *Id.* ¶ 15 (emphasis in original).

The District does not dispute the pay differential. But it offers a "legitimate, non sex-based factor" to justify it. *Goodrich*, 815 F.2d at 1523–24; *see also Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 920 (9th Cir. 1983) ("[S]alary differentials based on unequal starting salaries do not violate the Equal Pay Act if the employer can show that the original disparity was based on a legitimate factor other than sex.").

The District explains that UDC's "unusual pay structure" for adjuncts "has no parallel at OCTO." Def's Reply to Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Def.'s Reply") at 8, ECF No. 28. Indeed, UDC has a separate compensation system. *Compare* 6B DCMR § 1130.3(b)(2) (setting salary guidelines for employees moving from one subordinate agency to another), *with* 8B DCMR §§ 1200–32 (UDC Classification and Compensation); *see also Davis v. Univ. of D.C.*, 603 A.2d 849, 851 (D.C. 1992) (noting that the District's Comprehensive Merit Personnel Act "treats educational employees of UDC differently from other District employees"). UDC bases

compensation on the "schedule of courses [George] accepted to teach in a given semester." Pl.'s Opp'n ¶ 14. It was a part-time, non-salaried position.

To be sure, George's part-time hourly rate at UDC "translates to a minimum salary of $100,000/year." Def.'s Ex. I, Salary Justification at 53, ECF No. 24-4. But George joined OCTO as a full-time, salaried employee "at the lowest end of the range for a CS-14." *Id.* Of course, a full-time, salaried position typically comes with benefits that do not apply to part-time positions. So the disparity in her starting salary gains little traction.

The crux of George's EPA claim is that she deserved the same compensation as the male Program Managers. She was "assigned responsibilities of a Program Manager," "was referred to as an IT Program Manager on her performance review documentation," and "[n]owhere was she ever formally or informally referred to as a Program Analyst." Pl.'s SOMF ¶ 1. George described her job duties as a "functional manager" who "manag[ed] the portfolio of projects and the advancement of the projects." Def.'s Mot. Ex. A, Dep. Tr. of Gayle George ("George Dep. Tr.") at 127:15–18, ECF No. 24-4. To George, the "only difference in work assignment between [her] and the other Program Managers was the technology portfolio/cluster of agencies for which they were assigned." Pl.'s Opp'n ¶ 11; *see also id.* ¶¶ 5–6, 16. But "she was paid nearly $50,000 less." *Id.* ¶ 13.

Evidence, however, suggests that George was *not* a Program Manager. For example, George's offer letter states that the District hired her for the "Career Service position of Program Analyst." Offer Letter at 19. More, George confirmed that Program Managers serve managerial roles, but she supervised no one and had no direct reports. George Dep. Tr. 127:9–15. Titled or otherwise, it seems unlikely that a "manager" would lack managees, particularly when her comparator managers admittedly had subordinates.

9

Perhaps a jury could still find that George served as a Program Manager despite her official job title and no subordinates. *Compare* Program Analyst Description at 39–42, *with* Program Manager Description at 44–47; *see also* Salary Justification at 53 (explaining that George "would manage several critical PMO initiatives that directly impact OCTO and our clients."). Even so, summary judgment is still appropriate. The District can show that the higher salaries of the male Program Managers reflect factors "other than sex." 29 U.S.C. § 206(d)(1).

Consider Bruce Jones, the Program Manager who George primarily relies on to show pay disparity. George claims that the District hired Jones a month after her "to work in the same capacity," but that he received "nearly $40,000 more" in compensation. Def.'s Mot. Ex. D, Pl.'s Interrogatory Resps. ¶ 12, ECF No. 24-4; *see also* Pl.'s Opp'n ¶¶ 7, 14. Unlike George, however, Jones made $137,008 in annual salary as Director of Information Technology for the District Lottery before joining OCTO. Harrison Decl. ¶ 37; *see* Def.'s Ex. H, D.C. Career Service Salary Schedule, ECF No. 24-4; *cf. Thompson v. District of Columbia*, 530 F.3d 914, 919 (D.C. Cir. 2008) (noting career service status of Lottery Board employee). The District also hired him from a "subordinate agency." *See* D.C. Code § 36-601.01(b) (establishing the Lottery Board as a "subordinate office within [the District's] Office of the Chief Financial Officer"). UDC was not a subordinate agency. So Jones could expect to receive a similar or slightly higher wage under the District's compensation system. *See* 6B DCMR § 1130.3(b)(2). George could not.

The other male Program Managers who George cites also fall short as direct comparators. *See* Pl.'s Opp'n ¶ 11. Khaled Falah and Carl Mecca were longtime career service employees who, unlike George, qualified for step increases under the District's seniority system. *See* Harrison Decl. ¶¶ 38, 40; 6B DCMR § 1414.1; Def.'s Ex. G, Pay Table, ECF No. 24-4. Indeed,

10

Falah interviewed George for her position and served on her selection committee. Pl.'s Opp'n ¶ 8. Adam Hoey and Glen Hickman worked as Management Supervisory Service managers, *see* Harrison Decl. ¶¶ 39, 41, which George admits was "not the type of position" she held, George Dep. Tr. 127:22–128:2. And Peter Olle was not an OCTO employee. Harrison Decl. ¶ 42. He was a contract employee whose salary was paid by the employing contractor, not the District.[5] *Id.*

The District thus shows that the male Program Managers received different pay based on factors "other than sex." And George offers no evidence to create a genuine issue of material fact to rebut these factors. The Court will grant the District summary judgment on George's EPA claim.

B.

"Title VII of the Civil Rights Act makes it unlawful for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (cleaned up).

A plaintiff can prove a Title VII claim through direct or circumstantial evidence. George appears to rely on circumstantial evidence here.[6] So her Title VII claim is subject to the burden-

---

[5] George also mentions that she received four offer letters before she started her position. Pl.'s Opp'n ¶¶ 17–18. But she fails to explain how that helps her EPA claim.

[6] George claims that Deputy Chief Technology Officer Haider Ali stated that "'management' preferred 'drama-free' Program Managers like Bruce Jones and that we 'girls should learn how to get along.'" Pl.'s SOMF ¶ 4. Although such a statement could constitute direct evidence of gender discrimination, George offers nothing to suggest that Ali (or his alleged remark) had *anything* to do with her termination. There is no evidence that Ali played any role in George's termination. Harrison recommended it. Harrison Decl. ¶ 29. And Vemulapalli and Human Resources approved it. *Id.* George thus fails to establish a "clear nexus between the 'stray

11

shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, George bears the initial burden of establishing a prima facie case of discrimination by establishing that: "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (cleaned up). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (cleaned up). Rather, "an employee suffers an adverse employment action if [s]he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).

If George states a prima facie case of discrimination, the burden shifts to the District to identify a "legitimate, non-discriminatory or non-retaliatory reason on which it relied in taking the complained-of action." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). If the District provides such an explanation, the critical question is whether George "produced sufficient evidence for a reasonable jury to find that the [District's] asserted non-discriminatory reason was not the actual reason and that the [District] intentionally discriminated against the employee." *Brady*, 520 F.3d at 494.

The Court "may not second-guess [the District's] personnel decision absent demonstrably discriminatory motive." *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (cleaned up). And George "bears the ultimate burden of proving that discriminatory animus was

---

workplace remark[]' and the adverse action." *Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 44 (D.D.C. 2014).

12

the determining cause of the personnel action." *Lancaster v. Vance-Cooks*, 967 F. Supp. 2d 375, 393 (D.D.C. 2013).

The District here offers a legitimate, nondiscriminatory (and nonretaliatory) reason for George's termination. George committed several failures on the MPD project and the Catalog Project in the "approximately seven-months of her employment" as a probationer. Def.'s Mem. at 37 (citing Harrison Decl. ¶¶ 27–33); *see also* Termination Letter. So the Court "need not—*and should not*—decide whether [George] actually made out a prima facie case." *Brady*, 520 F.3d at 494. The question is whether George produced sufficient evidence for a reasonable jury to disbelieve the District's proffered explanation. She has not.

George's unequal compensation is insufficient for the reasons discussed above. Recall that the male Program Managers who George cites as direct comparators are not "nearly identical" to her. *See Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) ("In order to show that she was similarly situated to the male employee, [plaintiff] was required to demonstrate that all of the relevant aspects of her employment situation were 'nearly identical' to those of the male associate.").

Consider again Program Manager Bruce Jones, George's favorite comparator. He was a career service employee who joined OCTO with a higher salary from a subordinate agency. George was not. Jones also was *not* reassigned to the Catalog Project, and he continued to "work on external-facing projects." Harrison Decl. ¶ 24. So George did not work on the same project or perform the same work at the time of her termination. She offers no evidence "to create a genuine issue of fact as to whether these nondiscriminatory explanations of her pay rate are pretextual." *Hinds v. Mulvaney*, 296 F. Supp. 3d 220, 237 (D.D.C. 2018) *aff'd* 2019 WL 5432064 (D.C. Cir. Mar. 28, 2019) (rejecting discrimination claim based on starting salary

differential where white male received higher pay in part because plaintiff's "pay [was] determined by a pay-setting tool based on her directly relevant work experience").

George also suggests that she "was the only one terminated for [the Catalog Project's] failure." Pl.'s SOMF ¶ 7. True, three of her male colleagues on the Catalog Project "received corrective action for failure to meet deadlines" but remained employed. Harrison Decl. ¶ 32c. But the District treated them differently "because they were not probationary employees and did not have prior performance issues," like George's failure on the MPD project. *Id*. George thus was not "nearly identical" to them.

George next cites specific remarks allegedly made to her. She claims Vemulapalli advised her to "get along" with everybody and that it would be better to "work it out in the department." Pl.'s SOMF ¶ 3 (cleaned up); *see also* Pl.'s Opp'n ¶ 24 (claiming Vemulapalli advised her to "get along" with everyone to "get the work done" (cleaned up)). George offers nothing more beyond her statement as evidence. In any event, these remarks do not suggest discrimination. They reflect an effort to resolve George's issues. Indeed, George notes that in this same conversation she learned that Bishop approached Vemulapalli and Washington about terminating George and they prevented it. Pl.'s Opp'n ¶ 24. These remarks thus do not bolster George's claim; they undermine it.

Finally, George's exhibits include a declaration from Program Manager Carl Mecca, who states, "I observed hostilities, disparate and unprofessional treatment of Gayle George on several occasions. We discussed them more than once." Pl.'s Ex. at 31. Mecca elaborates no further. He does not offer any concrete examples of such treatment, or link the treatment in any way to George's termination. At best, this evidence "create[s] only a weak issue of material fact," which does not help George survive summary judgment. *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d

1284, 1291 (D.C. Cir. 1998) (en banc) ("[T]here may be no legitimate jury question as to discrimination in a case in which a plaintiff has created only a weak issue of material fact as to whether the employer's explanation is untrue, and there is abundant evidence in the record that no discrimination has occurred.").

At bottom, George has not produced sufficient evidence to undermine the District's legitimate, nondiscriminatory reason for her termination. The District is entitled to summary judgment on the Title VII discrimination claim.

## C.

George also claims that the District retaliated against her because she complained about her unequal pay and discrimination. *See, e.g.*, Pl.'s Opp'n ¶¶ 19, 37.

The Fair Labor Standards Act ("FLSA") "generally prohibits retaliating against an employee 'because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to' its protections, including those of the Equal Pay Act." *Perez*, 305 F. Supp. 3d at 57 (quoting 29 U.S.C. § 215(a)(3)).

Title VII similarly "makes it unlawful to . . . retaliate against . . . an employee 'because [s]he has opposed any practice made an unlawful employment practice by this subchapter.'" *McGrath v. Clinton*, 666 F.3d 1377, 1379–80 (D.C. Cir. 2012) (quoting 42 U.S.C. § 2000e–3(a)).

To make out a retaliation claim, George must establish that "(1) [s]he engaged in protected activity; (2) [s]he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (cleaned up). The challenged action need not be "workplace-related or employment-related" so long as it likely would have "dissuaded a reasonable worker

from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006) (cleaned up).

Although the antiretaliation provisions of Title VII and the FLSA are not identical, "[w]hen appropriate, courts look to Title VII cases in interpreting the FLSA." *Cooke v. Rosenker*, 601 F. Supp. 2d 64, 72 (D.D.C. 2009) (citing cases). "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

George appears to raise three retaliation theories: (1) interference from Shani Jones; (2) assignment to the Catalog Project and denial of any reassignment; and (3) termination.[7] None helps George survive summary judgment.

*First*, George claims that Shani Jones—the Supervisory IT Specialist who worked on the Catalog Project, *see* Harrison Decl. ¶ 23—engaged in "deliberate interference" and a "retaliatory campaign of harassment," *see* Pl.'s Opp'n ¶ 19. Jones was not George's supervisor, but the two worked on some projects together. *See* George Dep. Tr. 69:6–70:1. George claims that Jones "refused to [] approve requisitions for projects on [George's] portfolio," "added requirements for [George] to have projects on her portfolio approved," "complicated approval flows," and "leveraged her approval power to be-little and humiliate [George] on communications with the customer." Pl.'s Opp'n ¶ 21.

---

[7] George does not clearly differentiate between the actions she relies on to show discrimination or retaliation under Title VII. Although the Court tried to categorize them appropriately, there is sufficient overlap that the same reasons would apply to grant the District summary judgment on both claims even if some actions are better construed as discrimination, not retaliation, or vice versa.

Perhaps.  But George does not show how this alleged interference relates to her protected activity.  Jones is a woman and did not supervise George.  *See* George Dep. Tr. 69:4–5.  Both these facts undermine—if not doom—her retaliation claim.  *Cf. Glass v. Lahood*, 786 F. Supp. 2d 189, 216 (D.D.C. 2011), *aff'd*, 2011 WL 6759550 (D.C. Cir. Dec. 8, 2011) ("[T]o the extent her claim is rooted in sex, the fact that [recommending official] is within the same protected class, if anything, also weighs against an inference of discrimination."); *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) (noting that "a replacement within the same protected class cuts strongly against any inference of discrimination").  Indeed, George admits her relationship with Shani Jones "was very combative" and "not a good interaction."  *Id.* 70:11–15.  Without more, it is reasonable to infer that Jones's conduct stemmed from a personality conflict, not in response to George's complaints.  And such personality conflicts do not create Title VII liability.  *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68.

George suggests that Jones "was known to be a personal friend of David Bishop and a protégé of Carol Washington," who managed the Catalog Project.  Pl.'s Opp'n ¶ 19.  But there is no suggestion, let alone evidence, that either directed Jones to engage in her alleged interference.  George's speculation based on "close-quarter relationships" falls flat.  *See* Def.'s Reply Ex. L, George Dep. Tr. 133:17–22, ECF No. 28-1.  And she offers nothing more to link Jones's actions to her complaints.[8]

George also submits that she was "directed to send the email taking responsibility for the delay on the Public Safety Data Exchange Project."  Pl.'s Opp'n ¶ 25; Pl.'s SOMF ¶ 5.  Even if

---

[8]  George also suggests that Bishop "did not correct Jones's interference."  Pl.'s Opp'n ¶ 20.  "A retaliatory failure-to-remediate claim is not actionable unless the underlying incident would itself be actionable."  *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015).  Since Jones's underlying conduct is not actionable, neither is Bishop's purported failure to act.

17

true, this fact does not undermine the asserted performance failures that contributed to George's termination.  Harrison Decl. ¶¶ 30–33.

*Second*, George claims that she was "constructively dismissed from [her] previous portfolio of duties" when OCTO assigned her to the Catalog Project and "denied [her] an invitation to detail to another agency."  Pl.'s Interrogatory Resps. ¶ 16.  She notes that OCTO reassigned another colleague, Adam Hoey, to duties he had managed before assignment to the Catalog Project, and that she was the "only Program Manager who was never reassigned duties from her previous portfolio."  Pl.'s Opp'n ¶ 27.

But the Catalog Project "was essential" and part of a major realignment at OCTO.  Harrison Decl. ¶¶ 22, 25.  The District also assigned four other employees to the Catalog Project, not just George.  *Id.* ¶ 23.  George identifies no tangible harm she suffered from this assignment.  *See Forkkio*, 306 F.3d at 1132 (finding assignment to supervisor that "may have caused him subjective injury" did not establish adverse action under Title VII because "it did not objectively harm his working conditions or future employment prospects").  The reorganization did not affect George's salary or compensation.  Harrison Decl. ¶ 26.  It is inconceivable that such a business decision would have deterred a reasonable worker from pursuing statutory rights.

The District's alleged refusal to reassign George elsewhere after assignment to the Catalog Project is also unpersuasive evidence of retaliation.  *See* Pl.'s Opp'n ¶¶ 26, 40; Pl.'s SOMF ¶ 6; Pl.'s Interrogatory Resps. ¶ 12.[9]  "Non-selection for a temporary position can constitute an adverse action if the position would have provided some tangible and objective benefit."  *Kangethe v. District of Columbia*, 206 F. Supp. 3d 661, 670 (D.D.C. 2016).  George

---

[9] George concedes that any failure to reassign her was not based on gender.  *See* George Dep. Tr. 115:18–22.

18

offers no evidence that a reassignment provided such a "tangible and objective benefit." *Id.* She explains instead that she wanted a reassignment to help contribute to agencies. *See* George Dep. Tr. 115:3–15 (explaining that "there were other openings, other things that I, you know, could have contributed to"). Hoey may have returned to a previous portfolio, but he was not in the same position as George. Recall that Hoey served as a supervising manager, *see* Harrison Decl. ¶¶ 11, 39, which was "not the type of position" George held, George Dep. Tr. 127:22–128:2.

*Third*, as discussed, the District has offered a non-retaliatory, legitimate reason for George's termination. The time between the protected activity and adverse action must be "very close" to suggest retaliation under the EPA or Title VII. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (cleaned up) (citing with approval a case holding that three-month interval was not close enough). In *Taylor v. Solis*, for example, the Circuit rejected a retaliation claim when two and one-half months had elapsed. 571 F.3d 1313, 1322 (D.C. Cir. 2009). The nearly three-month time lapse between George's complaint and termination cannot alone rebut the District's proffered reason for George's termination here.[10] *See Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) ("[P]ositive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine.").

George fails to create a genuine dispute of material fact that the District retaliated against her for complaints about unequal pay and discrimination. The Court therefore will grant summary judgment to the District.

---

[10] George argues that the District fired her "[w]ithin 5 months from the time of [her] first complaint about discriminatory treatment and unequal pay." Pl.'s Opp'n ¶ 42. Mindful of her *pro se* status, the Court liberally construes this to refer to her first *informal* complaint.

**D.**

One final issue remains.  George refers to a "hostile work environment" at several points throughout her opposition brief.  *See* Pl.'s Opp'n ¶¶ 38, 40, 48–49.  For example, George states that "Shani Jones was also implicated for harassing [her] and contributing to the hostile work environment."  *Id.* ¶ 38.  The Court does not understand George to pursue such a claim.  *See* Compl. III. at 4 (referring only to discrimination and retaliation claims).

In any event, George "has not shown that [her] employer subjected [her] to discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018) (cleaned up).  Even if George is correct that Jones "refused to approve requisitions" for George's projects, or "complicated approval flows," or used her "approval power to be-little and humiliate [George] on communications with the customer, Pl.'s Opp'n ¶ 21, "these are not the kind of 'extreme' conditions that [the Circuit] and the Supreme Court have found to constitute a hostile work environment," *Hill*, 897 F.3d at 237.

The District thus is entitled to summary judgment on any hostile environment claim, even if properly raised.

**IV**.

For these reasons, the District's motion for summary judgment will be granted.  A separate Order will issue.

Dated:  March 25, 2021                                           TREVOR N. McFADDEN, U.S.D.J.